KATHERINE K. PURNELL ET AL. *v.* UNION TRUST COMPANY.

[No. 20, April Term, 1934.]

*Decided June 11th, 1934.*

The causes were argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*J. Abner Sayler*, with whom was *J. Mayer Willen* on the brief, for the appellants.

*Hilary W. Gans*, with whom were *Brown & Brune* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

J. Hurst Purnell, the husband of the appellant, Katherine K. Purnell, was, in 1931, and for a time prior thereto, in the real estate business in the city of Baltimore, trading under the name of "J. Hurst Purnell, Inc." He was president and active head of the company and owned nearly all of the stock. His wife was the owner of only a very few shares of the stock. The company owned some unimproved land in a development known as "Keswick," which was subdivided into lots upon which houses were built with the view of selling them at a profit.

On the 2nd day of February, 1931, J. Hurst Purnell, Inc., borrowed from the appellee, Union Trust Company, $5,000, and gave to that company its promissory note for that amount, indorsed by J. Hurst Purnell individually, and assigned to it certain mortgages as collateral security therefor.

On the 28th day of May, 1931, J. Hurst Purnell and wife borrowed of her brother, William G. Knapp, the sum of $5,000, and, to secure its payment, gave to him their interest bearing note containing a power to confess judgment thereon.

J. Hurst Purnell, Inc., desired to increase its line of credit with the Union Trust Company, and on the 9th day of July, 1931, J. Hurst Purnell and Katherine K. Purnell, his wife, as required by the Union Trust Company, executed a paper writing in the nature of a guaranty, by which they agreed to indemnify the Union Trust Company against all loss it might suffer, to the extent of $22,000, in consequence of the credit granted by it to J. Hurst Purnell, Inc.

Thereafter, on the 4th day of January, 1932, the note for $5,000, given by J. Hurst Purnell, Inc., to the trust company, heretofore mentioned, was renewed, with the individual indorsement of J. Hurst Purnell thereon; and on the 6th day of January, 1932, J. Hurst Purnell, Inc., borrowed the further sum of $17,000 from the Union Trust Company, and gave to the latter company its note for that amount, indorsed by J. Hurst Purnell individually.

In December, 1931, J. Hurst Purnell had become sick, and as a result thereof was confined to his home. While in that condition he found it necessary to borrow money to tide over his financial difficulties. He asked his brother-in-law, William G. Knapp, to go to the bank of the Union Trust Company, and ask Mr. W. Graham Boyce, its vice president, to call to see him at his, Mr. Purnell's, home. This Mr. Knapp did, though Mr. Boyce did not call at the home of Mr. Purnell until the following month, January, 1932. At that time Mr. Purnell applied to the Union Trust Company, through Mr. Boyce, for a loan of $10,000, and offered him as collateral security a second mortgage of $10,000, following a first mortgage of $25,000, executed to the Safe Deposit & Trust Company upon No. 4314 St. Paul St., Baltimore, where he then resided, and owned by him and Mrs. Purnell; the cost thereof being $75,000. This security was not satisfactory to Mr. Boyce and further security was required. Shortly thereafter, Mr. Boyce met William G. Knapp and his father at the Maryland Club, and there suggested to William G. Knapp that he should help his brother-in-law, Mr. Purnell. Mr. Knapp had a life insurance policy of $25,000, the cash value of which at that time was about $12,000. This he agreed to assign to the Union Trust Company as a further security for the loan of $10,000 to Mr. and Mrs. Purnell, and, on January 14th, 1932, the trust company loaned to Mr. and Mrs. Purnell $10,-000, secured by a second mortgage on their home, which was executed by them to his brother-in-law William G. Knapp, and by him assigned to the appellee, together

with said policy of insurance on the life of William G. Knapp.

On February 8th, 1932, J. Hurst Purnell died. Mrs. Purnell was thereafter made president of J. Hurst Purnell, Inc., and took over its management. Robert Biggs remained counsel to the company, and also advised Mrs. Purnell in certain matters in connection with the settlement of her husband's estate.

Mrs. Purnell collected the sum of $26,280.33 upon certain life insurance policies held by her husband at the time of his death, in which she was the beneficiary. This money she deposited in the Union Trust Company. $19,-954.20 of it she deposited in a savings account, and $6,326.11 in a checking account, in which she had previously deposited the $10,000 borrowed by herself and husband from the trust company, and secured by the mortgage executed to her brother and assigned by him to the Union Trust Company.

After the death of Mr. Purnell, Mrs. Purnell, then the president of J. Hurst Purnell, Inc., and Mr. Biggs, counsel for that company, planned to erect some new dwellings on part of the unimproved land held by the company. To effect this end they got in touch with Robert A. Brady and his brother, builders, and a written agreement was entered into by them with the Purnell Company, by which the latter was to convey four lots of land to the former, trading as the Colonial Homes Company, subject to certain ground rents. By this agreement the Colonial Homes Company was to erect four dwellings on these lots for the company.

On June 14th, 1932, J. Hurst Purnell, Inc., leased the four lots to the Colonial Homes Company, and on the same day the Colonial Homes Company entered into an agreement with Mrs. Purnell, by which she agreed to advance, individually, to it, from time to time, money, not to exceed in the aggregate $14,000, to be used by the Colonial Homes Company in the building of the four houses, and, to secure her in the repayment of the amount so to be advanced, the Colonial Homes Company executed to her, individually, a construction mortgage for $14,000.

The first payment of Mrs. Purnell to the Colonial Homes Company, pursuant to the agreement between her and that company, was $500, made on the 25th day of June, 1932, by a withdrawal of that amount from her savings account of $19,954.20, in the Union Trust Company. This payment was followed by other withdrawals from that account made by her from time to time, until the payments thereon, including the one made on the 14th day of November, 1932, of $350, aggregated $14,600. No explanation was given for the payment of the additional $600, when the mortgage amounted only to $14,000. After November 14th, 1932, Mrs. Purnell withdrew from her savings account, at three different times, the aggregate sum of $5,000, which was used for her own individual purposes; the amount of her account after such withdrawals being $1,276.18.

On December 18th, 1932, Robert Biggs became seriously ill and was confined to his home and thereafter did not return to his office, but died February 23rd, 1933.

In December, 1932, Mr. Knapp asked Mrs. Purnell for a payment on account of the $5,000 note which he held and for the insurance policy assigned by him, which, as already stated, had a cash value of about $12,000. She was unable to pay him in cash, and, in lieu thereof, she, on February 6th, 1933, made a settlement with him by assigning to him the Colonial Homes Company mortgage of $14,000, which assignment was duly recorded on February 27th, 1933, and he returned to her the note of $5,000, given to him by her and her husband.

On April 18th, 1933, Mr. Dunn, vice president of the trust company, demanded of Mrs. Purnell that she assign to his company the Colonial Homes mortgage which she had assigned to her brother on February 27th, 1933. This, of course, she could not do because of the previous assignment of the mortgage to her brother, and thereafter Mrs. Purnell was not permitted to draw the balance of her account, $1,276.18.

On June 19th, 1933, Mr. Knapp instituted, through J. Abner Sayler, his attorney, foreclosure proceedings upon

the mortgage assigned to him by his sister. Mr. Sayler was appointed trustee, and he sold the property for $24,-000. An auditor's account was thereafter stated allowing the sum of $15,239.94 to Mr. Knapp for his mortgage claim. Of this amount, $14,000 was due on the mortgage, $241.48 for cash advanced by the mortgagee in the payment of ground rent, and the balance, $998.66, as interest. Thereafter, demand was made upon Mr. Knapp by the Union Trust Company for the amount of money allowed him by the auditor.

Upon Mr. Knapp's refusal to recognize the claim of the trust company, the latter filed its bill of complaint in this case. In it, it alleged, in addition to the facts above stated:

"That the proceeds of said insurance policies," $19,954.24, were deposited in a savings account with the Union Trust Company "pursuant to an understanding and agreement between" the Union Trust Company "and Katherine K. Purnell, or her duly authorized agent or attorney, to protect" the trust company "on account of her guaranty of the notes of the said J. Hurst Purnell Company, Incorporated."

"That the said fund remained on deposit until the month of June, 1933, as an impounded fund for the purpose aforesaid, and the said defendant, Katherine K. Purnell, was not permitted to withdraw any part of the deposit while the note aforesaid remained unpaid."

"That during the month of June, 1932, the said Katherine K. Purnell, or her duly authorized agent or attorney, represented to this complainant that this property, which was unimproved, was the principal asset of the corporation, and unsalable as such, but that if it, or a portion of it, were improved, the property could be disposed of at a profit, and that if the complainant would allow the said defendant, Katherine K. Purnell, to use the money then standing to

her credit in the impounded savings account, she could finance the development of a portion of this property, and that if the complainant consented, she would withdraw from said account from time to time only such sums as were needed in said construction, and would protect all such sums by a first mortgage on this property, which mortgage would be held by her for the benefit of" the defendant, or be assigned to it, and that after the completion of the improvements, the property would be refinanced and the money withdrawn from said account would be returned, to be applied in extinguishment of her indebtedness to the complainant on account of her guaranty of the notes of said corporation.

"That relying on the representations, promises and understandings aforementioned, the complainant agreed to permit the defendant, Katherine K. Purnell, to make withdrawals from said impounded savings account for the purposes aforesaid, and the said defendant, Katherine K. Purnell, did, on or about June 26th, 1932, and from time to time thereafter, make withdrawals of substantially all the money theretofore held in said impounded savings account, pursuant to said representations, promises and understanding.

"That thereafter your complainant requested the said Katherine K. Purnell to assign to it" the mortgage executed by the Colonial Homes Company to her, "which she held for the complainant, pursuant to the understanding and agreement, hereinabove referred to, but the said Katherine K. Purnell has refused to do so.

The prayers of the bill are:

First. That the court decree that the trust company is the owner of the mortgage from the Colonial Homes Company to Mrs. Purnell, as-

signed by her to William G. Knapp and the debt secured thereby, as well as the proceeds of the sale of the mortgaged property to an amount sufficient to satisfy the mortgage claim.

Second. That J. Abner Sayler, trustee, be enjoined and prohibited by order of the court from paying or distributing any proceeds of sale to William G. Knapp or Katherine K. Purnell in satisfaction of said mortgage claim.

Third. That the court direct the trustee to pay and distribute to the trust company, out of the proceeds of sale under the mortgaged property, an amount sufficient to satisfy the said mortgage claim.

Fourth. That the court direct William G. Knapp to enter the decree in the foreclosure proceedings to the use of the Union Trust Company, etc.

Each of the defendants answered the bill. Mrs. Purnell, in her answer, denied that the proceeds of the policy were deposited by her pursuant to any understanding or agreement made by her, or any agent or attorney of her, with the Union Trust Company, by which it was agreed or understood that the deposit was made to protect the company on account of the guaranty of the notes of the J. Hurst Purnell, Inc. She not only denied that she made any such arrangement, as alleged in the bill, but she further denied that she ever authorized any agent or attorney to make any such arrangement on her behalf. She also denied that the funds so deposited were in any way impounded for the purpose of so protecting said plaintiff, or that she was not permitted to withdraw any part of said deposit from said plaintiff, or was ever told that she could not withdraw the same until the early part of the year of 1933, when she had withdrawn almost the entire amount of the deposit. In her answer, she averred that the deposit was made by her without any solicitation on the part of the plaintiff, or any agent or servant thereof, and that the only reason for so depositing it with the

plaintiff was because she felt that the plaintiff bank at that time was solvent and a safe place for depositing money, and that she would be permitted to withdraw the same at any time she so desired. She further averred in her answer that the mortgage of $14,000, assigned to William G. Knapp, was assigned to him for a valuable consideration, and that the demand upon her to assign the mortgage to the trust company was made several months after the assignment of it to her brother. The defendant William G. Knapp, in his answer, denied the allegation in the bill that at the time of the assignment of the mortgage to him he had full knowledge of the plaintiff's right to it, and the company's demand that it be assigned to it. He further averred that he gave to his sister a valuable consideration for the mortgage, and he held the same as a *bona fide* purchaser for value, without any notice of any claim of the plaintiff in and to said mortgage.

At the conclusion of the evidence, heard upon the bill and answers, the court decreed that the plaintiff, "the Union Trust Company is entitled to the sum of $14,998.66 out of the fund of $15,239.94, now held by J. Abner Sayler, Trustee," it being a part of the proceeds from the sale of the property therein, under the mortgage foreclosure proceedings, "which by the account of the auditor * * * was awarded to William G. Knapp, assignee of said mortgage," and the court further decreed that the trustee be enjoined from paying or distributing any portion of said sum either to William G. Knapp, the assignee, or to Katherine K. Purnell, but directed that he pay the same to the Union Trust Company. It is from that decree that the appeal in this case is taken.

The chief or main question in this case is, Did Mrs. Purnell, or her authorized attorney or agent, for or on her behalf, enter into an agreement with the Union Trust Company, or its agent or agents, impounding her money and creating a trust thereof for the benefit of the bank.

W. Graham Boyce, vice president of the Union Trust Company, testified that he said to Mr. Robert Biggs, counsel to J. Hurst Purnell, Inc., and with whom he had

conferred, in connection with the loan of $10,000 to Mr. and Mrs. Purnell, that, as Mrs. Purnell would soon come into possession of the money arising under the life insurance policies left by her husband, in which she was the beneficiary, it would be necessary for the trust company to obtain a judgment against her, under her guaranty, unless he, Mr. Biggs, could arrange it so that the money would be deposited with the Union Trust Company, where it would have a bankers' lien thereon. That, a few days thereafter, on February 23rd, 1932, upon the collection of the insurance money, it was deposited in his institution. Mr. Biggs was not present at the opening of the account, but he, prior thereto, had arranged for it, and he again saw Mr. Biggs after the account was opened. When asked if there were any restrictions placed on that account by the bank against withdrawal by Mrs. Purnell, he said, "Yes, there would be no money withdrawn without an O. K. * * * I think I told them not to release any money without my own O. K., because I was handling the negotiations." After the money was deposited, Mr. Biggs and Mrs. Purnell conceived the idea of building some houses on the lands held by J. Hurst Purnell, Inc., and "Senator Biggs persuaded me to let him use this money (meaning the deposit of Mrs. Purnell), to build these houses. * * * From time to time I O. K.'d advances for this purpose, with the understanding with Mr. Biggs that when the property was sold the money would be repaid to us, or we would get a first mortgage on this property, and, on that understanding, I released this money to build these houses." He further testified that the withdrawals were O. K.'d from time to time either by him or Mr. Dunn. When asked if Mrs. Purnell at any time came to the bank with Mr. Biggs, his reply was: "I could not say that definitely. * * * I saw them both frequently, but I do not know whether they were together or not." Witness also stated that when the request was first made to him by Mr. Biggs to allow this money to be used in building the houses for J. Hurst Purnell, Inc., he refused the request, and granted it only upon the conditions stated above, but when asked

was this in Mrs. Purnell's presence, he said: "I talked to her about that (that is, about building the houses), but I do not know whether I refused her or Mr. Biggs, but I refused."

On cross-examination the witness was shown the original passbook of Mrs. Purnell and was asked: "Tell us whether there is anything on that book to show that the account was impounded or tied up in any way so that she could not withdraw the money freely." His reply was: "No, nothing on that book to show that, that was by agreement with Senator Biggs."

As stated by witness, there remained in the savings account of Mrs. Purnell, after the withdrawals mentioned, the sum of $1,300. This was taken from the account and entered as a payment on the $5,000 note of January 4th, 1932, given to the trust company by J. Hurst Purnell, Inc. This was done in the exercise of the trust company's right under its bankers' lien, without the knowledge of Mrs. Purnell.

Helen M. Summers, an employee of the trust company, "in charge of the Savings Department at the main office of the Trust Company," testified that, when the savings account was opened by Mrs. Purnell, "I was told by * * * Mr. John Dunn, Vice-President, to flag this account and advise him of every withdrawal asked for by Mrs. Purnell." The flagging of the account, it seems, consisted of placing a red card in a position on the ledger card. This card was not upon the account at the time of the trial, because, as stated, the account had been closed and the card removed.

Mrs. Marguerite Norris, who had been employed by the Union Trust Company, but was not in its employ at the time of the trial, testified that she had instructions as to Mrs. Purnell's account similar to those stated by Miss Summers. She frequently waited on Mrs. Purnell at the times of the withdrawals mentioned, but before paying her the money asked for, she would call up the main office and get in touch with Mr. Boyce or Mr. Dunn, while she was still at the window. The telephone used by

her was close to the window and, at such times, Mrs. Purnell "was usually right in front of the window and I am quite sure she knew that I was calling up to find out whether the transfer could be made."

Mrs. Purnell, who had in July, 1932, signed a guaranty with her husband, J. Hurst Purnell, in which she became liable for the payment of debts owing by J. Hurst Purnell, Inc., to the Union Trust Company to the extent of $22,000, testified that she had no "personal knowledge of the Hurst Purnell Company having given to the Union Trust Company a note for $5,000, and another note for $17,000 dated in January, 1932," until after the controversy herein had arisen. These notes were not indorsed by her, but only by her husband.

She further testified that she, through Mr. Tom Green, collected some $25,000 life insurance money upon policies left by her husband; that Mr. Biggs had nothing to do with its collection; that she did not authorize him to go to the Union Trust Company and did not know that he had been there in relation thereto; that she told him nothing about it. "You mean to say that Mr. Biggs and you had no discussion as to how much you would put in the checking account and how much in the savings? A. Absolutely not." Mr. Green asked her where she was going to put the money, when he paid it to her. She asked him "where he would put it, and he said, 'I would put it in the Union Trust Company, about as safe and sound as any bank. You go on down to the bank and I will 'phone Mr. Dunn and tell Mr. Dunn you are coming down,' and I went right straight from Mr. Green's office down to the bank and saw Mr. Dunn. He said Mr. Green had telephoned to him, and when I gave him the check, he said 'how do you want me to put it in the bank,' and I said, 'well, will I get more money if I put it in the savings account,' and he said, 'yes, four per cent.' I said, 'suppose we put $19,000.00 in the savings account and $6,000.00 in the checking account, and when I use the $6,000.00, I can take some more and put it over,' and he said, 'yes, you can.' That is all he said to me."

She deposited to her personal account, which consisted of what remained of the $10,000 that she and her husband had borrowed on the mortgage upon their home. She was not told that she "could not take out any of the money except upon the special approval of an officer of the bank." At the time of this deposit, she had no knowledge of the indebtedness of $22,000 of the J. Hurst Purnell, Inc., to the Union Trust Company. Up to that time no one had said anything to her about it. Her attention was called to the signature card, which had been offered in evidence, and upon which appeared the names of Mr. Biggs and Mr. Green. She said: "I do not know what his name was doing on there." He was not present when the deposit was made, nor did he receive any direction or authority from her to do anything in relation thereto; that any agreement made with the Union Trust Company by Mr. Biggs affecting the disposition of this money was without her knowledge or authority.

Witness also testified that no part of the $10,000 borrowed from the Union Trust Company by herself and husband was expended in payment of debts of the J. Hurst Purnell, Inc., as shown by the stubs of her checks upon that account, exhibited in the case. It was expended for their personal expenses or indebtedness. As stated by her, she and her husband would not have mortgaged their home for the J. Hurst Purnell, Inc. And $6,000 of the insurance money deposited to her checking account was likewise expended in the payment of their personal expenses and indebtedness, without any objections from the Union Trust Company.

Mrs. Purnell's attention was called to the testimony of Mrs. Norris, wherein she stated that, when she came to the bank to get money, it was her custom to call down by telephone to some one and ask for permission to pay out money to her, "Did you ever hear her talk to anybody on the telephone with reference to your taking out money? A. No, she would take the book back and put it in a machine and get the money out and hand it to me. I have no recollection of her talking over the 'phone. If she did,

I did not hear her. She said a 'phone was right near and she did that and you were near by too. Did you hear her talk to anybody? A. I did not."

She also testified that the money paid to the Bradys, $14,000, was her individual money and was not paid by her as an officer of the company, that nothing was paid to her on the Brady mortgage, and, in addition thereto, she advanced money in the payment of ground rents. This too was paid, as she says, "out of her own pocket." At the time her brother loaned her the $5,000 referred to, they were in desperate straits. That this money was still owing to him at the time the Brady mortgage was assigned to him, with the exception of $125, which had been paid upon it. This note was returned to her when the mortgage was assigned to him. Her brother had also surrendered to the Union Trust Company the policy of insurance as further security for the repayment of the $10,000, and this was the status or condition existing between them at the time he made the request that she return to him some of the money he had loaned to her and her husband. This was in December, 1932. "I tried to figure out some way to pay it off, and I found I could not do it. He demanded some cash and I could not give it to him. I told him I have a home worth about $75,000, but do not have any ready cash, and all I had was these mortgages. If he wanted those, he could have them and he said, well, he wanted them, * * * and she said, well, then you take it and I gave it to him."

In saying "these mortgages," she meant one mortgage on the four houses. The witness stated that she did not discuss her personal affairs with her brother, nor did her husband, so far as she knew. He knew very little of their affairs. Mrs. Purnell testified that she was the executrix of her husband, and Mr. Biggs served as her counsel in certain matters connected with the settlement of his estate; that he filed the will and the inventory of the estate, and did certain other things in connection therewith. The other papers filed in the orphans' court, it seems, were filed by Mr. Sayler, after the death of Mr. Biggs.

William G. Knapp, the brother of Mrs. Purnell, testified as to the loan of $5,000 to his sister and her husband, for which a note was given to him, upon the back of which was a credit of $125. He stated, too, this was all that was paid upon the note; that neither Mr. Purnell nor his wife ever talked to him of their business affairs. He absolutely knew nothing about the business affairs of his sister and her husband, nor did his sister ever speak to him about the financial condition of the J. Hurst Purnell, Inc. It was upon the suggestion of Mr. Boyce that he rendered aid to his sister and her husband at the time of the loan of $10,000 by the Union Trust Company to them; he was told by Mr. Boyce that the company would take a second mortgage for $10,000 upon their home on St. Paul Street, if it was guaranteed by him, Mr. Knapp. It was then that he put up the $25,000 insurance policy referred to. He was asked, "At the time you got the mortgage from the Colonial Home Company from your sister, did you have any knowledge of any claim of the Union Trust Company against your sister?" His answer was, "absolutely none at all."

The evidence, as disclosed by the record, fails to establish the fact that Mr. Biggs was the agent of Mrs. Purnell in relation to the insurance money deposited by her with the Union Trust Company.

As stated by Judge Parke, speaking for the court in *Blacher v. National Bank of Baltimore*, 151 Md. 518, 135 A. 383, "Where the relation of agency is dependent upon the acts of the parties, the law makes no presumption of agencies, and then it is always a fact to be proved, with the burden of proof resting upon the person alleging the agency to show not only the fact of its existence, but also its nature and extent. *Mechem on Agency* (2nd Ed.) secs. 255, 281, 298, 316, 318, 1344." *Forest Hill Permanent Bldg. Assn. v. Fisher*, 140 Md. 666, 670, 118 A. 164.

Mr. Biggs was attorney for the J. Hurst Purnell, Inc., of which Mr. Purnell was president, and for Mr. Purnell personally; also counsel for Mrs. Purnell as executrix of her husband in certain matters in connection with the set-

tlement of his estate, but it is not shown that he was attorney or agent to act for her in other matters. The money here involved, received by Mrs. Purnell upon the policy of insurance, was not paid to her through the settlement of her husband's estate, but was paid independently thereof by the insurance company. As stated by Mrs. Purnell, Mr. Biggs was in no way associated with the collection or disposition of this money. It was her individual money, to be disposed of by her, unless that power was conferred upon Mr. Biggs, and this fact is not disclosed by the record. It could have been impounded by the trust company. In fact, it is claimed by it that it was impounded for a period of several months. though such fact was not known to Mrs. Purnell, when it released the money upon an alleged agreement with Mr. Biggs acting, as claimed by the company, under authority conferred upon him as the agent of Mrs. Purnell. The claim is made by the appellee company that by the agreement with Mr. Biggs there was a trust created of this fund, so released, in favor of the company, which rendered the assignment of the Brady mortgage to Mr. Knapp invalid. The binding force and effect of this agreement depended upon the answer to the question whether he, Mr. Biggs, was authorized by her as her agent to make such an agreement. As we have herein held that the proof did not establish such agency, our answer to this question must be in the negative.

It may also be said that the evidence does not disclose that Mrs. Purnell and her brother, Mr. Knapp, in the assignment of the mortgage to him, collusively acted to deprive the plaintiff of what rightfully belonged to it. While Mrs. Purnell assumed certain liability by the execution of the guaranty mentioned in the event of the J. Hurst Purnell, Inc., becoming indebted to the appellee, she, in fact, as stated by her, did not know of the creation of any such indebtedness until after the deposit and the withdrawals thereof made by her. As testified to by Mr. Knapp, he knew little or nothing of the affairs of his sister or her husband and had no knowledge of the indebtedness of the

J. Hurst Purnell, Inc., to the appellee, or the claim made by it to the mortgage assigned to him.

There were exceptions taken by the appellants to the admission of certain evidence, but these we need not decide or pass upon, in view of our stated position upon the question of agency.

From what we have said, the decree appealed from will be reversed.

*Decree reversed, and bill dismissed, with costs to the appellant.*